1

2

3

4

Patrick W. Mause, SBN 024269
LAW OFFICE OF PATRICK MAUSE, PLLC
290 N. Meyer Avenue
Tucson, AZ 85701
(520) 342-0000
(520) 342-0001 (fax)
Patrick@PMauseLaw.com

5

*Attorney for Plaintiff*

6

7

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

8

9

10

11

12

13

14

15

16

| Jill Koskinen, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Standard Insurance Company, an Oregon corporation; Albertson's LLC, a Delaware limited liability company | **ERISA BENEFITS, 29 U.S.C. § 1132(a)(1)** |
| Defendant. | **ERISA EQUITABLE RELIEF, 29 U.S.C. § 1132(a)(3)** |

17

18

For her claims against Defendants Standard Life Insurance Company and Albertson's LLC, Plaintiff Jill Koskinen alleges as follows:

19

I. **PARTIES, VENUE, AND JURISDICTION**

20

21

1. At all times material hereto, Ms. Koskinen was a resident and citizen of Pima County, Arizona.

22

23

24

2. Defendant Standard Life Insurance Company ("The Standard") is a foreign insurance company authorized to do business in, and doing business in Pima County, Arizona.

25

26

3. Defendant Albertson's LLC is a foreign grocery store chain authorized to do business in, and doing business in Pima County, Arizona.

27

28

4. The Court has jurisdiction over this case under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*

5.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because Ms. Koskinen is a resident and citizen of Pima County, Arizona; the life insurance coverage at issue in this case covered Ms. Koskinen's husband in Pima County, Arizona; Ms. Koskinen's husband obtained the life insurance coverage at issue in this case through his employment with Albertson's LLC in Pima County, Arizona; both defendants may be found in Pima County, Arizona or are subject to this Court's jurisdiction in Pima County, Arizona; and the harm occurred in Pima County, Arizona.

**II.    MS. KOSKINEN'S HUSBAND ELECTS $200,000 IN "ADDITIONAL" LIFE INSURANCE COVERAGE FROM THE STANDARD IN JUNE 2015 AND REMAINS COVERED WHILE PAYING PREMIUMS FOR THE NEXT FOUR YEARS.**

6.     In 2015, and due to a corporate merger or acquisition Ms. Koskinen's husband, John Koskinen ("John") began work for Albertson's.

7.     As part of his benefits package with Albertson's, John was eligible for life insurance coverage under a group life insurance plan (the "Plan") issued to Albertson's.

8.     The Plan was insured by an insurance policy issued to Albertson's by The Standard.

9.     The Standard is the claims administrator of the Plan.

10.    As the claims administrator, The Standard is responsible for analyzing life insurance claim.

11.    As the claims administrator, the Standard is also responsible for paying life insurance claims when it finds the beneficiary is entitled to benefits.

12.    Under the Plan, John automatically received life insurance in the amount of $39,000. Albertson's paid the premiums on that $39,000 in life insurance coverage.

13.    Effective June 1, 2015, John elected $200,000 in "additional" life insurance under the Plan.

14.     John was responsible for paying, and paid premiums on, the "additional" $200,000 in life insurance company to The Standard through a payroll deduction processed by Albertson's.

15.     John's payroll deductions for the $200,000 in "additional" life insurance were reflected in his Albertson's pay stubs.

16.     John's benefit "Confirmation Statement" from Albertson's dated June 20, 2018 reflected that Albertson's continued to pay premiums to The Standard for the $39,000 in basic life insurance coverage.

17.     John's benefit "Confirmation Statement" from Albertson's dated June 20, 2018 also reflected that he continued to pay premiums to The Standard for the additional $200,000 in life insurance coverage.

18.     John elected and paid premiums for the $200,000 in "additional" life insurance so that if he died prematurely, his wife, plaintiff Jill Koskinen, would "be taken care of."

19.     Among other things, John elected and paid premiums for the $200,000 in "additional" life insurance so that if he died prematurely, Ms. Koskinen would have "a place to live if something happened to him."

III.    THE STANDARD ACCEPTS PREMIUMS ON THE ADDITIONAL $200,000 IN LIFE INSURANCE COVERAGE FOR FOUR YEARS BEFORE JOHN PASSES AWAY.

20.     John began paying premiums to The Standard for $200,000 in additional life insurance coverage effective June 1, 2015.

21.     John continued paying premiums to The Standard for $200,000 in additional life insurance coverage through May 31, 2019.

22.     On May 11, 2019, John he passed away due to an unexpected medical condition.

23.     At the time John passed away, his premiums for the $200,000 in "additional" life insurance were fully paid.

24.     At the time John passed away, he was covered under the Plan.

**IV.    STANDARD DENIES MS. KOSKINEN THE FULL $200,000 IN ADDITIONAL LIFE INSURANCE DESPITE THE FACT THAT JOHN HAD PAID PREMIUMS TO THE STANDARD FOR FOUR YEARS.**

25.     Following her husband's death, Ms. Koskinen applied for life insurance benefits through The Standard.

26.     The Standard analyzed Ms. Koskinen's claim and declared that John had not provided the required "Evidence Of Insurability" ("EOI") when he elected the $200,000 in additional life insurance benefits in June 2015.

27.     From June 2015 until John's death on May 11, 2019, The Standard did not inform John that he had failed to provide EOI for the $200,000 in additional life insurance coverage.

28.     From June 2015 until John's death on May 11, 2019, Albertson's did not inform John that he had failed to provide EOI for the $200,000 in additional life insurance coverage.

29.     From June 2015 until John's death on May 11, 2019, The Standard did not require John to provide EOI for the $200,000 in additional life insurance coverage.

30.     From June 2015 until John's death on May 11, 2019, Albertson's did not require John to provide EOI for the $200,000 in additional life insurance coverage.

31.     From June 2015 until John's death on May 11, 2019, The Standard did not inform John that his additional life insurance benefits would be limited to $100,000 if he passed away due to an alleged failure to provide EOI.

32.     From June 2015 until John's death on May 11, 2019, Albertson's did not inform John that his additional life insurance benefits would be limited to $100,000 if he passed away due to an alleged failure to provide EOI.

33.     From June 2015 until John's death on May 11, 2019, Albertson's deducted premiums for the full $200,000 in "additional" life insurance benefits from his pay and forwarded the premiums to The Standard.

34.     From June 2015 until John's death on May 11, 2019, The Standard accepted premiums on John's full $200,000 in "additional" life insurance benefits.

35.     After receiving Ms. Koskinen's claim, The Standard's "Account Specialist On-Site," Susan Bittick, began analyzing the claim.

36.     On May 31, 2019 Ms. Bittick e-mailed her co-worker, Mali Knapp, stating: "Yuck. I'm reaching out to the SuperValue [Albertson's] benefits team to see if they have any information re: why they entered $200k back then… he's hourly, so his GI [Guarantee Issue Amount] would only have been 100k." (ellipsis in original).

37.     The Standard's Mali Knapp responded a few hours later stating: "Thank you! I attached the original email once they get back to you [sic], but I'm glad to hear I wasn't crazy lol [meaning 'laughing out loud']."

38.     The Standard's Susan Bittick responded a few hours later stating: "Not good news. There is nothing unusual to justify the $200k. I've attached my email to their TPA (SuperValu's benefits admin group)." (parenthetical in original).

39.     One week later, on June 6, 2019, The Standard wrote to Ms. Koskinen offering "our sincere condolences" but informing her that The Standard would only pay "Basic Life $39,000" and "Additional Life $100,000."

40.     The Standard therefore denied Ms. Koskinen the full $200,000 in additional life insurance benefits John had elected and for which he paid four years' of premiums.

41.     On June 11, 2019, The Standard processed an internal "Request for Refund of Premium."

42.     The "Reason for Refund" given in the "Request for Refund of Premium" form was "Did not provide EOI for increase."

43.     The "Refund for Period" documented in the "Request for Refund of Premium" form was "6/1/2015 – 5/31/2019 (48 months)." (parenthetical in original).

44.     The amount of the premiums The Standard intended to refund to Ms. Koskinen was $1,094.40.

45.     On June 17, 2019, The Standard wrote to Ms. Koskinen informing her that it would only pay $100,000 in additional life insurance coverage.

46.     Among other things, The Standard's June 17, 2019 letter stated:

    a.  "Unfortunately, we must limit the claim by the additional $100,000 in Plan 2 (additional) Life Insurance benefits that were originally claimed." (parentheses in original).

    b.  "According to the information we received from the Policyholder, John Koskinen was hired on February 12, 2003, and he elected $100,000 in Plan 2 Life Insurance. On May 29, 2015, he increased his Plan 2 Life Insurance to $200,000, but he did not provide Evidence of Insurability."

    c.  "According to the above [Plan] Evidence Of Insurability provision, Evidence Of Insurability is required for any Plan 2 Life Insurance Benefit in excess of the Guarantee Issue Amount of $100,000. It is also required for any elective increase in Plan 2 Life Insurance."

    d.  "Because Evidence Of Insurability was not provided by John Koskinen and approved by The Standard, Mr. Koskinen was not eligible for more than $100,000 in Plan 2 Life Insurance under this Group Policy, and we must limit this claim by the additional $100,000 originally claimed."

47.     In its June 17, 2019 letter, The Standard also stated it was enclosing "a premium refund check for $1,094.40, which represents a refund of premiums paid for the $100,000 in Plan 2 Life Insurance benefits. This refund is for the period of June 1, 2015, to May 31, 2019."

48.     Ms. Koskinen has not deposited or cashed The Standard's cynical premium refund check.

**V.     MS. KOSKINEN APPEALS THE STANDARD'S DENIAL TO STANDARD AND ALBERTSON'S, POINTING OUT A CONTROLLING, 2017 NINTH CIRCUIT DECISION THAT REQUIRES PAYMENT OF THE FULL BENEFITS.**

49.     On August 2, 2019, Ms. Koskinen timely appealed The Standard's wrongful decision denying her $100,000 of the $200,000 in additional life insurance benefits her husband had elected and for which he paid four years' of premiums.

50.     Ms. Koskinen faxed her appeal to The Standard on August 2, 2019.

51.     Ms. Koskinen also sent her appeal to The Standard via USPS Priority Mail.

52.     Ms. Koskinen's appeal to The Standard was delivered on August 9, 2019.

53.     Ms. Koskinen sent her appeal to Albertson's via USPS Priority Mail.

54.     Ms. Koskinen's appeal to The Standard was delivered on August 9, 2019.

55.     A true and correct copy of Ms. Koskinen's faxed appeal letter to The Standard, including the fax confirmation sheet, is attached as Exhibit 1.

56.     Ms. Koskinen's appeal letter to Albertson's was identical to her appeal letter to The Standard.

57.     In her appeal, Ms. Koskinen informed The Standard and Albertson's that a 2017 Ninth Circuit case controls the outcome of her claim and directs that she is entitled to the full amount of the "additional" life insurance

coverage John had elected and for which he paid four years' of premiums. *See* Ex. 1, Appeal Letter at pp. 3-4 (discussing *Salyers v. Metro. Life. Ins. Co.*, 871 F.3d 934, 941 (9th Cir. 2017)).

     a. In *Salyers*, the plaintiff initially elected $500,000 in dependent life insurance coverage on her husband through her employer's ERISA-governed benefits plan.

     b. Ms. Salyers reduced the dependent life insurance coverage on her husband to $250,000 effective January 1, 2014 and paid premiums on that amount of coverage through a payroll deduction.

     c. Because Ms. Salyers elected more than $20,000 in additional, dependent life insurance, she was required to provide "evidence of insurability" for her husband to MetLife.

     d. Ms. Salyers' husband passed away on January 10, 2014; nine days after Ms. Salyers' election of $250,000 in additional life insurance became effective.

     e. MetLife reviewed Ms. Salyers claim and denied the full $250,000 in additional life insurance coverage due to the failure to provide "evidence of insurability" for her husband.

     f. The Ninth Circuit found Ms. Salyers' employer "was acting as MetLife's agent for purposes of collecting, tracking, and identifying inconsistencies with the evidence of insurability requirement." *Salyers*, 871 F.3d at 941.

     g. The Ninth Circuit then found MetLife had "waived" the plan's "evidence of insurability" requirement:

> The deductions of premiums, MetLife and Providence's failure to ask for a statement of health over a period of months, and Providence's representation to Salyers that she had $250,000 in coverage were collectively so inconsistent with an intent to enforce the evidence of insurability requirement as to induce a reasonable belief that it had been relinquished. Accordingly, MetLife waived the evidence of insurability requirement, and it cannot contest coverage on that basis.

*Id*. (internal quotations, citations, footnote, and brackets omitted)).

    h.   The Ninth Circuit held: "Accordingly, we REVERSE and REMAND with instructions to enter judgment in favor of Salyers for the amount of the $250,000 policy that remains unpaid." *Id* at 942 (all-caps in original).

58.    Under *Salyers*, Ms. Koskinen is entitled to the full $200,000 in additional life insurance John elected and for which he paid four years' of premiums.

59.    Under *Salyers*, and because The Standard accepted four years' of premiums from John for the additional $200,000 in life insurance benefits, The Standard waived John's "Evidence Of Insurability" requirement.

60.    As Ms. Koskinen explained in her appeal, she is entitled to the $100,000 in unpaid "additional" life insurance benefits which The Standard denied.

61.    In her appeals, Ms. Koskinen further informed The Standard and Albertson's that even if waiver did not apply under *Salyers*, she was entitled to "make whole" equitable relief under *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011).

62.     In her appeals, Ms. Koskinen informed The Standard and Albertson's that her "make whole" equitable relief could take the form of "equitable reformation of a plan to conform to the administrators' representations," a "surcharge against an administrator to provide the plan participant or beneficiary with the benefit she had been promised," or "the administrator may be equitably estopped from asserting certain plan defenses." (*See* Appeal Letter, Ex. 1 at 4-5).

63.     Under ERISA, Ms. Koskinen is entitled to "make whole" equitable relief such that she is entitled to receive the full amount of John's additional life insurance benefits, including the $100,000 that remains unpaid.

64.     In her appeal letter, Ms. Koskinen also informed The Standard that "because it failed to challenge Mr. Koskinen's coverage within the deadlines set by the plan's incontestability clause" it waived the enforceability of the Evidence Of Insurability requirement. (*See* Appeal Letter, Ex. 1 at 6 (citing *Patterson v. Reliance Standard Life Ins. Co.*, 986 F. Supp. 2d 1140, 1150 (C.D. Cal. 2013)).

65.     Because The Standard waived the Plan's Evidence Of Insurability requirement, Ms. Koskinen is entitled to the full amount of John's additional life insurance benefits, including the $100,000 that remains unpaid.

## VI.   THE STANDARD DENIES MS. KOSKINEN'S APPEAL.

66.     On September 19, 2019, The Standard denied Ms. Koskinen's appeal.

67.     Albertson's has not responded to Ms. Koskinen's appeal.

68.     Despite *Salyers*, The Standard's denial rationale relied upon the Plan's requirement that Mr. Koskinen submit "Evidence Of Insurability" to obtain life insurance beyond the "Guarantee Issue Amount of $100,000."

69.     The Standard also asserted the "Group Policy has a Clerical Error And Misstatement provision, which specifies any clerical error made by the

Policyholder, Employer, or their respective employees will not cause a person to become insured."

70.    The Standard's denial letter continued, stating: "Please note that the Albertson's LLC Group Life Insurance Policy is self-administered, which means they collect premiums and retain records for the group. As such, The Standard would not have known, until this claim was filed, that Albertson's LLC was collecting premiums from Mr. Koskinen for Plan 2 Life Insurance in the amount of $200,000, although under the terms of the Group Policy he was not insured for greater than the Guarantee Issue Amount of $100,000."

71.    Upon information and belief, when an Albertson's employee would request life insurance in excess of the Guarantee Issue Amount ("GI") and provide Evidence Of Insurability ("EOI"), The Standard would underwrite the additional life insurance benefits.

72.    Upon information and belief, when an Albertson's employee would request life insurance in excess of the GI amount and provide EOI, The Standard would analyze the EOI to determine whether the insurance in excess of the GI amount should be issued.

73.    Upon information and belief, when an Albertson's employee would request life insurance in excess of the GI amount and provide EOI, The Standard would deny coverage above the GI amount if The Standard found the insured was a poor underwriting risk.

74.    Upon information and belief, when an Albertson's employee would request life insurance in excess of the GI amount and provide EOI, The Standard would only approve coverage above the GI amount if The Standard found the insured was a reasonable underwriting risk.

75.    Upon information and belief, The Standard does not rely upon Albertson's to underwrite employee requests to obtain life insurance coverage in excess of the GI amount.

76.     The Standard's June 17, 2019 letter denying Ms. Koskinen's claim states: "Because Evidence Of Insurability was not provided by John Koskinen <u>and approved by The Standard</u>, Mr. Koskinen was not eligible for more than $100,000 Plan 2 Life Insurance under this Group Policy…" (emphasis added).

77.     Because The Standard must approve requests for life insurance in excess of a GI amount, The Standard knows when EOI is and is not provided.

78.     Upon information and belief, The Standard has a bad faith pattern and practice of issuing insurance in excess of a plan's guarantee issue amount without requiring evidence of insurability. *See e.g. Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1268 (10th Cir. 2014) ("Thus, our holistic review of the complaint reveals Plaintiffs' primary focus is the Division's and Standard's creation and implementation of a scheme to accept and retain premiums without providing the paid-for coverage" due to an alleged failure of insureds to provide "evidence of insurability"); *Smith v. Standard Ins. Co.*, 2019 WL 5295195, at *1 (W.D. Okla. Oct. 18, 2019) ("The additional payment sought by Plaintiff represents an optional coverage under the policy that Mrs. Smith had elected to receive and had paid additional premiums for, but that Standard later determined she was not entitled to because additional paperwork, known as evidence of insurability or EOI, had not been completed.").

79.     Upon information and belief, The Standard's bad faith pattern and practice of issuing insurance in excess of a plan's guarantee issue amount without requiring evidence of insurability is a deliberate or reckless business practice intended to maximize The Standard's receipt of premiums while avoiding potential liability on such policies.

80.     Upon information and belief, The Standard has deliberately or recklessly instituted a practice of not auditing insurance issued in excess of a guaranteed issue amount in order to maximize The Standard's profits at the expense of its insureds.

81.     Upon information and belief, The Standard does not audit insurance issued in excess of a guaranteed issue amount and therefore does not return premiums to insureds who failed to provide evidence of insurability unless and until the insured makes a claim for the excess insurance.

82.     Upon information and belief, The Standard has never audited insurance coverage that ended such as through an insured's change in employment, an employer's change in insurance carrier, or otherwise, to determine whether The Standard accepted premiums on insurance provided in excess of a guaranteed issue amount.

83.     Upon information and belief, because The Standard has never audited insurance coverage that ended such as through an insured's change in employment, an employer's change in insurance carrier, or otherwise, to determine whether The Standard accepted premiums on insurance provided in excess of a guaranteed issue amount, it has never refunded premiums on insurance issued in excess of a guaranteed issue amount.

84.     Upon information and belief, because The Standard has never audited insurance coverage that ended such as through an insured's change in employment, an employer's change in insurance carrier, or otherwise, to determine whether The Standard accepted premiums on insurance provided in excess of a guaranteed issue amount, and because The Standard has therefore never refunded premiums on insurance issued in excess of a guaranteed issue amount, The Standard has fraudulently earned millions of dollars in profits; all of which was done deliberately and/or recklessly and solely for The Standard's benefit and at the expense of its insureds.

85.     At all times material hereto, The Standard knew that John had enrolled in, and was paying premiums for, life insurance in excess of the GI amount.

86.     Because The Standard must approve requests for life insurance in excess of the GI amount, because The Standard knew at all times that John had enrolled in and was paying premiums for insurance in excess of the Plan's GI amount, and because The Standard accepted premiums on John's insurance in excess of the GI amount for four years, The Standard knew he had not submitted EOI for the four years it accepted premiums on his insurance in excess of the GI amount.

87.     The Standard's statement in its September 19, 2019 letter denying Ms. Koskinen's appeal that it "would not have known, until this claim was filed, that Albertson's LLC was collecting premiums from Mr. Koskinen for Plan 2 Life Insurance in the amount of $200,000" is false.

88.     The Standard's statement in its September 19, 2019 letter denying Ms. Koskinen's appeal that it "would not have known, until this claim was filed, that Albertson's LLC was collecting premiums from Mr. Koskinen for Plan 2 Life Insurance in the amount of $200,000" is consistent with The Standard's pattern and practice of deliberately and fraudulently accepting premiums on life insurance issued in excess of a guaranteed issue amount with no intent of ever paying such benefits to an insured or his or her beneficiary if the insured dies while covered under the applicable life insurance plan.

89.     Upon information and belief, The Standard knew that its statement in its September 19, 2019 letter denying Ms. Koskinen's appeal that "The Standard would not have known, until this claim was filed, that Albertson's LLC was collecting premiums from Mr. Koskinen for Plan 2 Life Insurance in the amount of $200,000" was false.

90.     Upon information and belief, despite knowing that its statement that "The Standard would not have known, until this claim was filed, that Albertson's LLC was collecting premiums from Mr. Koskinen for Plan 2 Life Insurance in the amount of $200,000" was false, The Standard included the

statement in its letter denying Ms. Koskinen's appeal intending that she rely upon the false statement.

91.     The Standard sent its September 19, 2019 letter denying Ms. Koskinen's appeal through the U.S. Mail.

92.     Upon information and belief, The Standard and its employees and/or agents have a pattern and practice of using mail and wire communications to disseminate false and fraudulent information and statements to insureds and beneficiaries with the intent that they rely on those statements.

93.     Upon information and belief, The Standard's and its employees' and/or agents' pattern and practice of using mail and wire communications to disseminate false and fraudulent information and statements to insureds and beneficiaries includes their pattern and practice of making false and fraudulent statements in connection with their fraudulent pattern and practice of accepting premiums on life insurance in excess of a guaranteed issue amount, which The Standard has no intent of ever paying.

94.     Upon information and belief, The Standard and its employees and/or agents have a pattern and practice of using mail and wire communications to engage in a pattern of racketeering activity, including numerous predicate acts of mail or wire fraud.

95.     Upon information and belief, The Standard's and its employees' and/or agents' pattern or racketeering activity is done for their own benefit, is done at the expense of The Standard's insureds and their beneficiaries, and has caused and will continue to cause its insureds and their beneficiaries harm, including having caused and continuing to cause Ms. Koskinen to suffer harm.

96.     Ms. Koskinen specifically reserves the right to conduct discovery to illuminate The Standard's and its employees' and/or agents' patterns of racketeering activity using mail and wire communications and to amend her

Complaint upon the discovery of such evidence to assert such claims as may be appropriate and warranted under the circumstances.

### COUNT ONE

### CLAIM FOR BENEFITS UNDER ERISA, 29 U.S.C. § 1132(A)(1)

97.     Plaintiff incorporates the preceding allegations as if fully set forth herein.

98.     When an insurance company accepts premiums on an ERISA-governed life insurance plan it waives "Evidence Of Insurability" requirements. *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 941 (9th Cir. 2017) ("The deductions of premiums, MetLife and Providence's failure to ask for a statement of health over a period of months, and Providence's representation to Salyers that she had $250,000 in coverage were collectively so inconsistent with an intent to enforce the evidence of insurability requirement as to induce a reasonable belief that it had been relinquished. Accordingly, MetLife waived the evidence of insurability requirement, and it cannot contest coverage on that basis." (internal quotations, citations, footnote, and brackets omitted)).

99.     The Standard accepted premiums from Ms. Koskinen's husband, John, for four years.

100.    The Standard never required John to provide "Evidence Of Insurability" during the four years it accepted his premiums.

101.    At all times material hereto, The Standard had provided Albertson's with actual or apparent authority to require and/or collect information under the Plan.

102.    At all times material hereto, Albertson's was The Standard's agent for purposes of requiring and/or collecting information under the Plan.

103.    During four years The Standard accepted John's premiums for $200,000 in life insurance coverage, The Standard never informed John that he was required to provide "Evidence Of Insurability."

104.    The Standard waived the Plan's "Evidence Of Insurability" requirement.

105.    Ms. Koskinen is entitled to the unpaid $100,000 in additional life insurance benefits.

106.    Ms. Koskinen is entitled to interest on the unpaid $100,000 in additional life insurance benefits as set forth below.

107.    Ms. Koskinen is entitled to attorney's fees and costs as set forth below.

**COUNT TWO**

**ENFORCEMENT OF PLAN "INCONTESTABILITY" CLAUSE,**

**29 U.S.C. § 1132(A)(1)**

**(IN THE ALTERNATIVE)**

108.    Plaintiff incorporates the preceding allegations as if fully set forth herein.

109.    The Plan contains an "Incontestability Provision."

110.    Under the Incontestability Provision, The Standard "will not use a misrepresentation to reduce or deny [a] claim after the insured's insurance has been in effect for two years during the lifetime of the insured."

111.    Mr. Koskinen paid premiums for the full $200,000 in "additional" life insurance benefits to The Standard for four years.

112.    Mr. Koskinen was insured under the Plan for 3 years and 344 days before he passed away.

113.    ERISA, 29 U.S.C. § 1132(a)(1)(B) permits the Court to "enforce [a beneficiary's] rights under the terms of the plan."

114.    Because the Plan's Incontestability Provision precludes The Standard from enforcing the Evidence Of Insurability requirement, the Court may enforce that provision and require The Standard to pay Ms. Koskinen the

-17-

unpaid additional life insurance benefits. *Patterson v. Reliance Standard Life Ins. Co.*, 986 F. Supp. 2d 1140, 1150 (C.D. Cal. 2013).

115.    Ms. Koskinen is entitled to the unpaid $100,000 in additional life insurance benefits.

116.    Ms. Koskinen is entitled to interest on the unpaid $100,000 in additional life insurance benefits as set forth below.

117.    Ms. Koskinen is entitled to attorney's fees and costs as set forth below.

**COUNT THREE**

**EQUITABLE RELIEF UNDER ERISA, 29 U.S.C. § 1131(A)(3)**

**(IN THE ALTERNATIVE)**

118.    Plaintiff incorporates the preceding allegations as if fully set forth herein.

119.    At all times material hereto, The Standard was a fiduciary under ERISA.

120.    At all times material hereto, Albertson's was a fiduciary under ERISA.

121.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, accepting premiums from John for $200,000 in additional life insurance coverage for four years without requiring evidence of insurability.

122.    Albertson's breached its fiduciary obligations to John and Ms. Koskinen by, among other things, accepting premiums from her husband for $200,000 in additional life insurance coverage for four years without requiring evidence of insurability.

123.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, not "auditing his [Mr. Koskinen's]

-18-

enrollment" in $200,000 in additional life insurance coverage when he first elected that coverage effective June 1, 2015.

124.    Albertson's breached its fiduciary obligations to John and Ms. Koskinen by, among other things, not "auditing his [Mr. Koskinen's] enrollment" in $200,000 in additional life insurance coverage when he first elected that coverage effective June 1, 2015.

125.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, failing to conduct the full and fair review of Ms. Koskinen's claim and appeal that are required by ERISA.

126.    Albertson's breached its fiduciary obligations to John and Ms. Koskinen by, among other things, failing to conduct the full and fair review of Ms. Koskinen's claim and appeal that are required by ERISA.

127.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, always placing its financial interests ahead of Ms. Koskinen's interests.

128.    Albertson's breached its fiduciary obligations to John and Ms. Koskinen by, among other things, always placing its financial interests ahead of Ms. Koskinen's interests.

129.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, relying on biased and outcome-driven claim reviews and claim personnel when evaluating Ms. Koskinen's entitlement to benefits.

130.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, failing to properly train and monitor claims personnel to ensure the coverage and claims were handled properly and fairly.

131.    Albertson's breached its fiduciary obligations to John and Ms. Koskinen by, among other things, failing to properly train and monitor claims personnel to ensure the coverage and claims were handled properly and fairly.

132.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, providing false statements to Ms. Koskinen in the letter denying her appeal.

133.    The Standard breached its fiduciary obligations to John and Ms. Koskinen by, among other things, deliberately instituting policies and procedures under which The Standard and its employees and/or agents knowingly accept premiums for insurance in excess of a plan's guaranteed issue amount with no intent of ever paying such benefits if the insured dies while covered under the increased plan benefit amount.

134.    Albertson's breached its fiduciary obligations to Ms. Koskinen by, among other things, failing to conduct any review of her appeal.

135.    Albertson's breached its fiduciary obligations to Ms. Koskinen by, among other things, failing to respond to Ms. Koskinen's appeal.

136.    To the extent Ms. Koskinen may be found not entitled to the full $200,000 in additional life insurance benefits under 29 U.S.C. § 1132(a)(1), Ms. Koskinen is entitled to equitable relief in the amount of the unpaid benefits pursuant to 29 U.S.C. § 1132(a)(3). *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 960–61 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016) (ERISA plaintiff may bring claim for equitable relief under § 1132(a)(3) in the alternative); *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711 (8th Cir. 2014) (where insurer failed to require "evidence of insurability" claim for equitable relief under ERISA was not futile); *Van Loo v. Cajun Operating Co.*, 703 F. App'x 388, 390 (6th Cir. 2017) (employer equitably estopped from voiding coverage when it did not require evidence of insurability)*; Snitselaar v. Unum Life Ins. Co. of Am.*, No. 17-CV-14-LRR, 2019 WL 279995 (N.D. Iowa Jan. 22, 2019) (life insurance beneficiary entitled to "'make whole relief' in the amount of benefits owed" under life insurance plan due to employer's failure to provide SPD which explained conversion rights); *Frye v. Metro. Life Ins. Co.*, No. 3:17-CV-31-DPM,

2018 WL 1569485 (E.D. Ark. Mar. 30, 2018) (life insurance beneficiary entitled to "make-whole relief" against employer and MetLife where they failed to enforce plan requirements while accepting premiums); *Echague v. Metro. Life Ins. Co.*, 43 F.Supp.3d 994, 1017 (N.D. Cal. 2014) (life insurance beneficiary entitled to "make whole" relief where employer failed to provide correct information in response to employees' inquiries about continuing coverage); *Lanpher v. Metro. Life Ins. Co.*, 50 F. Supp. 3d 1122 (D. Minn. 2014) (life insurance beneficiary entitled to make-whole relief where insurer approved additional coverage but failed to notify employee); *French v. Dade Behring Life Ins. Plan*, 906 F. Supp. 2d 571, 584 (M.D. La. 2012) (life insurance beneficiary stated claim for equitable relief where complaint alleged insurer and employer failed to notify employees of need for "Evidence of Insurability").

137.    In particular, Ms. Koskinen is entitled to equitable relief to compensate her for the harms caused by The Standard's and Albertson's fiduciary breaches in the amount of $100,000 plus interest and attorney's fees as set forth below.

138.    Ms. Koskinen's equitable relief may include, but is not limited to: equitable reformation of the life insurance contract to provide the full amount of coverage John elected and for which he paid four years' of premiums; a surcharge against The Standard and/or Albertson's in the full amount of coverage John elected and for which he paid four years' of premiums; and/or equitable estoppel against The Standard and/or Albertson's to bar it from enforcing the Plan's "Evidence Of Insurability" requirement and thereby to provide the full amount of coverage John elected and for which he paid four years' of premiums. *CIGNA Corp. v. Amara*, 563 U.S. 421, 440–42 (2011); *Moyle*, 823 F.3d at 960-961; *Patterson v. Reliance Standard Life Ins. Co.*, 986 F. Supp. 2d 1140, 1150 (C.D. Cal. 2013)

139.    In order to obtain equitable relief, Ms. Koskinen "need only show harm and causation." *Amara*, 563 U.S. at 444.

140.    Ms. Koskinen has been harmed by The Standard's fiduciary breaches.

141.    Ms. Koskinen has been harmed by Albertson's fiduciary breaches.

142.    The harms Ms. Koskinen has suffered were caused by The Standard's fiduciary benefits.

143.    The harms Ms. Koskinen has suffered were caused by Albertson's fiduciary benefits.

144.    Ms. Koskinen is entitled to the unpaid $100,000 in additional life insurance benefits.

145.    Ms. Koskinen is entitled to interest on the unpaid $100,000 in additional life insurance benefits as set forth below.

146.    Ms. Koskinen is entitled to attorney's fees and costs as set forth below.

COUNT FOUR

OTHER EQUITABLE RELIEF UNDER ERISA, 29 U.S.C. § 1131(A)(3)

147.    Plaintiff incorporates the preceding allegations as if fully set forth herein.

148.     At all times material hereto, The Standard was a fiduciary under ERISA.

149.    At all times material hereto, Albertson's was a fiduciary under ERISA.

150.    As set forth above, The Standard breached its fiduciary obligations to John and Ms. Koskinen.

151.    As set forth above, Albertson's breached its fiduciary obligations to John and Ms. Koskinen.

152.    The fiduciary breaches by The Standard and Albertson's have caused Ms. Koskinen to suffer harm that is separate and distinct from the loss of the $100,000 in additional life insurance benefits.

153.    The separate and distinct harms Ms. Koskinen has suffered due to The Standard's and Albertson's fiduciary breaches include but are not limited to:

   a. Having to finance $23,000 for a new vehicle at 6.99% interest, which Ms. Koskinen would not have done had she received the full amount of additional life insurance benefits she was entitled to receive.

   b. Continuing to pay 3.625% interest on $77,000 of her mortgage, which she would have paid off had she received the full amount of additional life insurance benefits she was entitled to receive.

154.    Ms. Koskinen will also incur attorney's fees and costs due to The Standard's and Albertson's wrongful denial of the additional $100,000 in unpaid life insurance benefits.

155.    Had The Standard and/or Albertson's not breached their fiduciary obligations under the Plan, Ms. Koskinen would not have had to incur attorney's fees or costs.

156.    The attorney's fees and costs Ms. Koskinen have or will incur constitute separate and distinct harms caused by The Standard's and Albertson's fiduciary breaches.

157.    Ms. Koskinen is entitled to "make-whole" equitable relief to compensate her for all harms she has or will suffer due to The Standard's and/or Albertson's fiduciary breaches, including but not limited to compensation for financial harm she suffered due to having to finance a vehicle and continue to finance her home. *Mullin v. Scottsdale Healthcare Corp. Long Term Disability Plan*, No. CV-15-01547-PHX-DLR, 2016 WL 107838, at *4 (D. Ariz. Jan.

11, 2016) ("It is conceivable that past due benefits, prejudgment interest, and attorneys' fees will be inadequate to put Mullin in the position she would have been in but for Omaha's alleged fiduciary misconduct. At the pleading stage, the Court is unable to conclude that Mullin's § 1132(a)(3) claim for a surcharge is impermissibly duplicative of her claim for benefits because, without factual development, the Court cannot determine whether Mullin's financial harm exceeds the relief available to her under § 1132(a)(1)(B)."); *McGlasson v. Long Term Disability Coverage for All Active Full-Time & Part-Time Employees*, 161 F. Supp. 3d 836, 844 (D. Ariz. 2016) (denying motion to dismiss where "Plaintiff seeks the imposition of a surcharge to compensate him for the extra-contractual losses resulting from Prudential's fiduciary breaches. Thus, a surcharge could potentially be a non-duplicative, appropriate equitable remedy.").

158. Ms. Koskinen is entitled to "make-whole" equitable relief to compensate her for all harms she has or will suffer due to The Standard's and/or Albertson's fiduciary breaches, including but not limited to compensation all attorney's fees and costs she has incurred or will incur. *Id*.

159. Upon information and belief, The Standard receives substantial interest, return on investment, and/or return on equity on unpaid insurance benefits.

160. To prevent the unjust enrichment of The Standard, and to make Ms. Koskinen whole for all the harms she has suffered as a result of The Standard's breaches of its fiduciary duties under ERISA, Ms. Koskinen seeks interest on the unpaid $100,000 in life insurance benefits at the maximum allowable rate, but in no event at a rate lower than the maximum rate at which The Standard earned interest, return on investment, or return on equity on the unpaid funds.

WHEREFORE, plaintiff Jill Koskinen prays for judgment as follows:

A.   For unpaid additional life insurance in the amount of $100,000;

B.   For interest on the unpaid additional life insurance of $100,000 at the maximum allowable legal rate, but in no event at a rate lower than the rate at which The Standard earned interest, return on investment, or return on equity on the unpaid benefits;

C.   For "make-whole" equitable relief to compensate Ms. Koskinen for the separate and distinct financial harms she has suffered due to The Standard's and Albertson's breaches of their fiduciary duties in an amount to be determined upon the trial of this matter;

D.   For attorney's fees and costs pursuant to 29 U.S.C. § 1132(g) and/or in an equitable amount sufficient to "make her whole" due to Defendants' breaches of their fiduciary duties;

E.   For such other relief, including equitable relief, that the Court deems just and proper.

DATED October 22, 2019.

LAW OFFICE OF PATRICK MAUSE, PLLC

By: s/ Patrick W. Mause
    Patrick W. Mause
    *Attorney for Plaintiff*